JANVIER, Judge.
This is a suit for workmen’s compensation brought by direct action against the insurer of the employer. From a judgment in favor of the employee for $35.00 a week for a period not in excess of 400 weeks, the defendant insurer has appealed suspensively, asserting that the employee has completely recovered from the injury, which admittedly resulted from an occupational accident, and that full compensation was paid during the period of actual disability.
Rudolph C. Hampton, employed by Clarke’s Garage as a car “hiker”, was required to park cars brought into the garage by customers and to return them to the customers when called for. He says that his “take home” pay was “around” $38.00 or $40.00 a week and that his tips from customers amounted to “about” $2.00 or $3.00: per day. There is no dispute about the amount of the award if plaintiff is entitled to compensation.
In order to expeditiously move the “hikers” from one floor of the garage to another, there was provided a belt lift or escalator to which were attached small' foot platforms on which they would stand in going up and down between the several floors.
On February 3, 1965, Hampton slipped from one of these foot platforms and fell a few feet to the concrete floor. While the exact é height from which he fell is not shown, apparently it was about four or five feet. He did not at first realize that he had sustained injury more serious than superficial bruises, and, after resting for a short time, he attempted to go back to work. When the rush period, which was from 4:30 to 6:00 p.m., arrived he found he could not do the work. He reported the matter to the floor captain, who apparently is an employee with little or no superior authority. At home his wife attempted, with hot bath and rubbing, to relieve the pain, with little or no success. On the next day he reported but suffered so that he could not work. He was sent to the doctors of the insurer of the employer, Drs. Houston, Roy & Faust. There he was examined by Dr. Frank E. Taormina, who was not a member of the *913 medical firm, but was employed by them. Dr. Taormina testified that:
“Mr. Hampton had tenderness on the left lateral hip and thigh. He had pain on rotation of the left leg. He had no limp, and had good posture, and the remainder of the examination was negative for any positive findings.”
Hampton was treated by Dr. Taormina or other doctors in that office for six weeks, and, at the request of Dr. Taormina, was examined by Dr. G. Gernon Brown, Jr., on March 4, 1965, which was about one month after the accident. On March 11 he was discharged as able to return to work. He says that he attempted to work for one day but could not stand the pain and that he went to the Charity Hospital but treatment was refused there since compensation insurance was involved.
The testimony on his behalf as to his condition, particularly as to whether he could or could not return to work, was given by Dr. Vernon R. Kroll and Dr. Raeburn C. Llewellyn.
The testimony to the effect that he was able to return to work was given by Dr. Taormina, Dr. Richard W. Levy, Dr. G. Gernon Brown, Jr., and Dr. Russell C. Grunsten.
It thus appears that, of the six doctors who testified, two were of the opinion that plaintiff could not return to his former employment and four felt that he could. Of these only Dr. Taormina treated him during the five or six weeks following the accident, though apparently he was treated during that time by some of the other doctors in the office in which Dr. Taormina was employed.
Dr. Kroll testified that he had examined plaintiff twice, once in June, 1965, which was about five months after the accident, and again on March 17, 1966, for the purpose of preparing to testify. The testimony of Dr. Kroll shows that, on his second examination, Hampton had improved considerably and that the area in which he claimed to suffer had to some extent changed its location. Dr. Kroll’s statements were based almost entirely on subjective findings, though he did state he found atrophy in the left leg which he attributed to the injury. He was asked whether he had made a measurement of the left calf, which had shown a decrease in circumference on one and one-half centimeters. He said that he had and that this showed that plaintiff had not been using his left leg as he had before and that such condition usually means “that there is some immobilization to the extremity * * * ” Finally, when asked whether he thought that plaintiff could return to work, he said that he did not suggest that he return to work, but added “if you want a good test on the man, make him go back to work, and if his back gets worse, I think you have a pretty clear cut picture.” And he further said: “If I were treating this man — and I am not, and I did not give recommendation — I would say that he go to the neurosurgeon and see whether or not this man should have further investigative studies.”
Dr. Llewellyn, who testified that plaintiff could not return to work, examined him on August 2, 1965, at the request of Dr. Kroll. The testimony of Dr, Llewellyn is criticized on the ground that it is to some extent based on incorrect statements which were made to him by plaintiff as to how he had been treated after the accident. Apparently, plaintiff told him that Dr. Kroll had treated him on the day of the accident and that he had been under his treatment during the period, of about seven months, between the time of the accident and the time at which Dr. Llewellyn examined him. The fact is that Dr. Kroll did not treat Hampton at all, but merely examined him on the two occasions already mentioned and that instead of Hampton receiving treatment of seven months, as a matter of fact, he had only been treated during the period of less than *914 six weeks and that in the • office ’ of Dr. Taormina. . This-is of importance only in that Dr. Llewellyn said that he-based his opinion, that plaintiff could not return to work, on the fact that “he had not gotten well iii my opinion and was not improving despite having received accepted forms of treatment * *
Dr. Llewllyn based his ultimate opinion, to a considerable extent, on statements made by plaintiff as to his suffering though he did make some objective findings, saying that on the day on which he had examined him “there was an objective sign of back soreness in my opinion. That is, something that I could see and feel, not something that the patient simply told me. There was visible and palpable spasm of the low back muscles on the left.”.
There was a suggestion by Dr. Llewellyn that there might have been injury to an in-tervertebral disc, though it is shown that no myleogram was performed. He was asked whether he had made any “positive finding sufficient to warrant or justify a diagnosis of a herniation of an intervertebral disc,” and he answered “ * * * I was unable to make a clinical diagnois on the basis of these findings. I felt that the patient should have additional studies to exclude the possibility of a ruptured disc.” The X-ray photographs, which were taken by Dr. Brown, showed no such injury, though it is conceded, of course, that sometimes X-rays do not show up such conditions.
The four doctors who testified for the defendant were positive in their opinions. Dr. Levy, after giving in detail his reasons for his conclusion, said: “It was my conclusion that this man did not have evidence of injury or disease of the lumbar spinal cord or nerve roots. I had no recommendations to make concerning other neurological diagnostic studies, and no neurosurgery was indicated. From the neurological standpoint, I saw no reason why he could not return to work.”
‘'-Dr. Brown, who at the request of Dr.‘ Taormina, had examined: plaintiff • for fhie purpose of determining whether he could return to work, described the various tests to which we have referred, and said:
“It was my opinion Mr. Hampton presented no objective evidence of residual injury to the lumbar — lumbosacral spine, pelvis or hips. I didn’t think this man was disabled, and I felt that he was able to return to his 'former occupation.”
Dr. Grunsten, an' orthopedic specialist, made the same tests, with the same results, and found that there was- no reason for the suffering of which plaintiff complains. He stated:
“ * * * It' was my feeling then that I could find no indication or suggestion of any injury, residual to the low back. No indication for orthopedic treatment was indicated and it was felt that the man should be encouraged to- resume’ what for him would be normal physical activity.”
Dr. Grunsten was asked whether he felt Hampton would be able to do the work he did at the time of the described accident, and he replied: “Yes, it was my impression on both occasions.”
When we come to consider the question of whether all of plaintiff’s sufferings were imaginary, it is interesting to note that in various examinations made by the several doctors the location of pain changed from time to time and that it was the opinion of almost all of the doctors that such changes were unusual if the locations were considerably different; on the different examinations. In the several tests made by the doctors who testified for defendant it appears that plaintiff responded differently to manipulations of the legs on many occasions, which would indicate untruthfulness. His ability to bend forward at the waist when standing was not at all consistent with his ability to make the same *915 movement when sitting on a table. One of the doctors referred to this situation as a “paradox”, meaning that it was more than unusual for pain to be. felt in one position when the same pain could not be felt when the legs were put into the same relative position in which they had been in the other tests.
As fo the truthfulness of the plaintiff on the question of whether he had exaggerated his suffering, we cannot overlook the statement of Dr. Llewellyn, who said: “The patient seemed to cooperate and I did not feel that' he distorted or purposefully magnified his complaints. * * * ”
In his reasons- for judgment, the District Judge said:
“ * * * It is the opinion of the Court that he was sincere and truthful.
“The Claimant is willing to subject himself to any further diagnostic tests, treatments, etc., that should be done to exclude a ruptured disc,- or to correct same if present.”
No useful purpose would be served by going into an even more detailed discussion of the complicated and most technical medical testimony. We have given it careful consideration, and feel that, if it were not for the reasons of the District Judge concerning the sincerity of the plaintiff, we could have readily reached the conclusion that plaintiff has entirely recovered and could, if he would, resume his former employment.
Counsel for defendant'have directed our attention to cases in which it has been- held' that where a plaintiff has exaggerated his - complaints and has attempted to persuade. doctors of disability when none exists, his statements may be disregarded and his suit, dismissed. Such a case is Lyons v: Mary-" land Casualty Company, La.App., 158 So. 2d 392. However, there the District Judge did not believe the plaintiff and said: “The court believes this plaintiff is a faker.” Here we have the reverse of that situation, for the District Judge was convinced that the plaintiff was not a “faker”, but was sincere. Then, too, we cannot overlook the statement of Dr. Llewellyn that, though he based his opinion to some extent on subjective findings, there .were objective symptoms which led to his conclusion and there is also the objective finding of Dr. Kroll as to atrophy to the left leg.
Our conclusion is that, because of these facts, we cannot say that the conclusion reached below was manifestly erroneous. We must, therefore, affirm the judgment.
The judgment appealed from is affirmed.
Affirmed.
Before REGAN, YARRUT, SAMUEL, CHASEZ, BARNETTE and JANVIER, JJ- ' "